[No. 57708-1.   En Banc.   January 23, 1992.]

NORTHWEST MOTORS, LTD., *Respondent,* v. KENNETH R. JAMES, ET AL, *Petitioners.*

*Michael M. Hanis,* for petitioners.

*Steven W. Klug,* for respondent.

SMITH, J. — Petitioners Kenneth R. and Rhondda C. James appeal a ruling of the Court of Appeals, Division One, granting an increase in the amount of a King County

Superior Court judgment in favor of Respondent Northwest Motors, Ltd., awarding attorneys' fees to respondent, and reversing an award of attorneys' fees to Petitioners James.

We affirm the Court of Appeals.

The recitation of facts is principally adapted from the opinion of the Court of Appeals and the findings of fact by the trial court.[1]

On May 22, 1984, Dr. Kenneth R. James (Petitioner) took his 1976 Jaguar XJ6 automobile for repairs to Northwest Motors, Ltd. (Northwest), an automotive repair shop specializing in Jaguars. He advised that his automobile had a gasoline leak, loss of water from the radiator, and a failed interior lamp. He also asked for an oil change. Petitioner did not request, nor did he receive, a written or oral cost estimate. He had been a customer of Northwest for 2 years. Upon examination of the Jaguar, Northwest employees discovered and replaced a failed fuel cooler and changed the oil. The cost was $256.14.

Inspection of the automobile also revealed a loss of cooling system pressure and contamination of the coolant and engine oil. When Petitioner James went to pick up his automobile, Northwest's owner, Talbott Campbell, advised him that the engine required further testing because of apparent contamination of the oil. Petitioner James indicated that he would return the automobile to Northwest for further service within a few days.

As promised, Petitioner James returned the automobile a few days after May 22, 1984. He parked it in front of the Northwest Motors repair shop without an appointment. Later that day, Petitioner telephoned Mr. Campbell and authorized him to test the Jaguar engine. Mechanics found water in the oil, indicating either a blown cylinder head gasket, a cracked or warped cylinder head, or a cracked block. Campbell informed Petitioner that he would have to remove the cylinder head to determine the precise problem, and that it would take from 3 to 5 days. Over the telephone,

---

[1] *Northwest Motors, Ltd. v. James*, 57 Wn. App. 364, 788 P.2d 584, 798 P.2d 813 (1990).

Petitioner James authorized the work, but did not request or receive an oral or written cost estimate.

Approximately 3 days later, Mr. Campbell telephoned Petitioner and reported to him that mechanics determined that the cylinder head was warped and the engine block was cracked between each cylinder. He asked Petitioner to come to the shop, but Petitioner declined. Instead, Petitioner asked for an oral estimate of the repair cost. Mr. Campbell gave Petitioner an estimate of $2,500, consisting of $500 for a used engine block and $2,000 labor for removal of the faulty one and installation of the replacement. He advised Petitioner that a new block could be obtained more quickly, but it would cost three times as much as a used one. The trial court found that the $2,500 estimate was the only one to which James consented, and that he believed that amount would cover all repair costs, including the cost for initial servicing of his automobile.

Northwest claimed that Petitioner was responsible for additional charges for reconditioning the radiator, replacing coolant and heater hoses, and installing other engine supports.

After a few days, in early June 1984, Petitioner James began telephoning Northwest to find out when repairs to his Jaguar would be completed. Mr. Campbell did not return his calls. They finally established communication by telephone. On June 28 or 29, 1984, Mr. Campbell told Petitioner that a used engine block had been located and the repairs would begin. As the work proceeded, Petitioner telephoned Mr. Campbell several times, but he was inaccessible to Petitioner until July 19, 1984. On that date, Mr. Campbell informed Petitioner that he had lost a mechanic and was running behind schedule. Petitioner told Mr. Campbell that he needed a replacement automobile, and indicated he would obtain a rental one. Mr. Campbell told Petitioner that his Jaguar would be available in a few days. After a few days, Petitioner released the rental automobile under the assumption that his Jaguar would be ready. The cost of the rental was approximately $100.

By July 19, 1984, Petitioner James advised Northwest that he wanted his Jaguar back regardless of the state of repair. About that time, Petitioner decided he would tender a check for the repairs in order to get his Jaguar back, but also decided he would stop payment on the check if he thought the charges were unfair. He believed $2,500, less a discount for inordinate delay, would be fair. He did not communicate any of these thoughts to Mr. Campbell or anyone else at Northwest.

The used engine block was installed in the Jaguar a few days later, but cooling system problems developed. Repairs for this took another week. On July 28, 1984, Petitioner telephoned Northwest about his Jaguar and was told that it was ready, but only required road testing. Petitioner informed Mr. Campbell that he wanted to pick up the Jaguar before leaving for a trip to Australia. Mr. Campbell assured him it would be ready. However, when Petitioner telephoned again to determine when he could pick it up, he was told it was not ready.

Petitioner James then left for Australia, and asked his secretary to telephone about the Jaguar while he was away on his trip. She was advised by Northwest that the automobile would not be ready until September 4, 1984. On that date, by then having returned from Australia, Petitioner James went to pick up his automobile. He was presented with invoices totaling $3,696.42. This was the first time he was told the cost would be more than $2,500, despite approximately 20 telephone calls to Northwest. After some discussion, Mr. Campbell agreed to reduce the invoice by $100 for rental expense and for Petitioner's "time and patience". Petitioner examined the documents and indicated his acceptance of the amount stated in them. Petitioner James asked for permission to pay one-half of the amount due then and the other half later, but Mr. Campbell refused. Petitioner then issued his check for $3,596.42, representing the total due of $3,696.42, less $100 for automobile rental. Mr. Campbell then returned Petitioner's Jaguar to him.

Petitioner James immediately directed his bank to stop payment on the $3,596.42 check payable to Northwest Motors. The bank dishonored the check on September 5, 1984. Petitioner immediately wrote Mr. Campbell a letter informing him that he had stopped payment because he was dissatisfied with the delay and with the cost of the repairs. He included in that letter another check payable to Northwest in the amount of $2,000. Northwest sent a "Notice of Sale/Chattel Lien", claiming $5,000 was owed. On January 25, 1985, Northwest sent Petitioner a notice of dishonor on the $3,596.42 check. When Petitioner did not pay, Northwest then filed this action against the Jameses to recover on the dishonored check.

The matter was submitted to mandatory arbitration in July 1985. The arbitrator awarded Northwest $3,029.30, with an award of $2,200 for attorneys' fees, for a total of $5,229.30. On October 25, 1985, Petitioner James offered $3,500 as settlement. Northwest rejected his offer.

Petitioner James appealed the arbitration award to the King County Superior Court and proceeded to trial de novo. The Honorable Nancy Ann Holman determined that Northwest had violated the Automotive Repair Act (RCW 46.71) and that Northwest was entitled only to the $2,500 that Petitioner James originally agreed to pay, less a $100 offset for automobile rental costs. The court determined that Petitioner James was justified in issuing a stop payment order on the check and that he was not liable to Northwest for attorneys' fees. The trial court awarded Petitioner James attorneys' fees in the amount of $4,989.80.

The Court of Appeals, Division One, on March 26, 1990, reversed the trial court and remanded the case for proceedings consistent with its opinion. The Honorable Susan R. Agid, writing pro tempore for the court, concluded that Petitioner James had not been justified in stopping payment on the check for $3,596.42 because the check constituted an "account stated". The court held that Petitioner was liable for the amount written on the check and for attorneys' fees, damages, and collection costs pursuant to RCW 62A.3-

515(1). The Court of Appeals also reversed the trial court's award of attorneys' fees.

The question presented on this appeal is whether the Court of Appeals was correct in determining that a check written by Petitioner Kenneth R. James for $3,596.42 to Respondent Northwest Motors, Ltd., to cover an automobile repair cost in order to obtain return of his automobile, a "stop payment" order being immediately made by Petitioner James on the check, constituted an "account stated" upon which Petitioner would be obligated. Or, in the alternative, whether the transaction constituted an "accord and satisfaction" upon which Petitioner would be obligated.

Petitioner argues four principal bases for his appeal. *First*, he states that an "account stated" cannot validate a contract for which there is no consideration, and that such a contract would violate public policy. *Second*, he claims that in Washington the obligation of an "account stated" is or should be limited to the amount of the antecedent debt. *Third*, he contends that the findings of the trial court establish that there was no accord, no agreement and no contract. Further, he argues that it was error for the Court of Appeals to rule to the contrary, absent a determination that such findings by the trial court were unsupported. *Fourth*, Petitioner states that if the Court of Appeals' interpretation of the law relating to "accounts stated" is correct, its application is precluded by misrepresentation of Northwest.

RCW 46.71.040(1), under the Automotive Repair Act, states in pertinent part:

> (1) If the price of the automotive repairs is estimated to exceed seventy-five dollars and the repairman chooses to preserve any right to assert a possessory or chattel lien or if the customer requests a written price estimate, the automotive repairman shall, prior to the commencement of supplying any parts or the performance of any labor, provide the customer a written price estimate or the following choice of estimate alternatives:
> " . . . .
> 1. I request an estimate in writing before you begin repairs. Contact me if the price will exceed this estimate by more than ten percent.

- - - - - - - - - - - - -

2. Proceed with repairs but contact me if the price will exceed $_ _ _ _ _ _ _. _ _ _ _ _ _ _ _

3. I do not want a written estimate. _ _ _ _ _ _ _ _ _ _ _ _"[2]

. . . .

(2) . . . If the customer signs or initials either alternative 2 or 3, no written price estimate is required unless the repairman chooses to preserve any right to assert a possessory or chattel lien. The repairman may not charge for work done or parts supplied which are not a part of the written price estimate and may not charge the customer more than one hundred ten percent, exclusive of retail sales tax, of the total shown on the written price estimate: *Provided,* That neither of these limitations shall apply if, prior to performing the additional labor and/or supplying the additional parts, the repairman obtains either the oral or written authorization of the customer to exceed the written price estimate. The repairman or his agent shall note on the written price estimate the date and time of obtaining an oral authorization.

RCW 46.71.047 provides:

If an automotive repairman is required by RCW 46.71.040 to provide the customer a written price estimate or a choice of estimate alternatives, the repairman is barred from recovering in an action to recover for automotive repairs any amount in excess of one hundred ten percent of the amount authorized by the customer unless the repairman proves by a preponderance of the evidence that his or her conduct was reasonable, necessary, and justified under the circumstances. In any action to recover for automotive repairs the prevailing party may, in the discretion of the court, recover the costs of the action and a reasonable attorneys' fee.[3]

---

[2]RCW 46.71.040 further provides that these alternatives are not required when the customer's motor vehicle has been brought to the automotive repairer without face-to-face contact with the repairer or representative at the regular place of business of the repairer. An automotive repairer is not required to provide a customer with a written price estimate or a choice of estimate alternatives except as required under the statute.

[3]RCW 46.71.050 further provides that if an automotive repairer performs work or supplies parts which are not a part of the written price estimate or exceed 110 percent of the written price estimate without the oral or written authorization of the customer, the repairer is barred from asserting a possessory or chattel lien for the amount of the unauthorized parts or labor upon the motor vehicle.

Northwest filed this action to collect on Petitioner James' dishonored check for $3,596.42 in accord with procedures under RCW 62A.3-515. That statute provides that "[w]henever a check . . . has been dishonored by nonacceptance or nonpayment the payee or holder of the check is entitled to collect a reasonable handling fee for each such instrument."[4] If not paid within 15 days, "and after the holder of such check sends such notice of dishonor . . . to the drawer . . . [the drawer] shall also be liable for payment of interest at the rate of twelve percent per annum from the date of dishonor and cost of collection not to exceed forty dollars or the face amount of the check, whichever is the lesser."[5] If a court action follows, the court "shall award a reasonable attorneys fee, and three times the face amount of the check or one hundred dollars, whichever is less".[6] RCW 62A.3-515 does not apply to any instrument dishonored because of a justifiable stop payment order.[7]

The Court of Appeals correctly observed that neither Washington statutes nor cases define "justifiable" as it pertains to RCW 62A.3-515. Petitioner James argues that the stop payment order was justified because he only agreed to pay $2,500 for the automobile repairs. He contends that Northwest violated the Automotive Repair Act which specifies when automotive repairers must provide written estimates of repair costs.

Northwest contends, and the Court of Appeals agreed, that Petitioner James' check for $3,596.42 constituted an "account stated". The Restatement of Contracts defines an "account stated" as "a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an

---

[4]RCW 62A.3-515(1).

[5]RCW 62A.3-515(1) .

[6]Former RCW 62A.3-515(1).

[7]RCW 62A.3-515(1).

amount due the creditor." It does not itself discharge any duty, but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms.[8]

In *National Ass'n of Creditors, Inc. v. Ultican*,[9] this court defined an "account stated" as an agreed balance between parties who have had previous dealings involving the payment of, or agreement to pay, money.[10] Additionally, an account stated determines the amount of a debt, some previous liability having existed, and does not of itself create a primary obligation.[11]

In this case, as the Court of Appeals observed, Mr. Campbell and Northwest presented Petitioner with a corrected invoice, showing charges for repair work accomplished, less a $100 credit for the rental automobile. Petitioner did not dispute the balance due and "manifested his acceptance of the amount stated".[12]

In *Dwelley v. Chesterfield*,[13] this court, in ascertaining the mutual intentions of contracting parties, stated that it had "long adhered to the objective manifestation theory of contracts." This theory imputes an intention to a person which corresponds to the reasonable meaning of that person's words and acts. The court in *Dwelley* determined that "Petitioner's unexpressed impressions are meaningless when attempting to ascertain the mutual intentions of [the parties]."[14] When Petitioner James tendered the $3,596.42 check to Respondent Northwest, he did not protest the repair costs nor the amount stated on the invoice. He did

---

[8]Restatement (Second) of Contracts § 282(2) (1981).

[9]190 Wash. 109, 66 P.2d 824 (1937).

[10]190 Wash. 109, 112, 66 P.2d 824 (1937).

[11]190 Wash. 109, 112-13, 66 P.2d 824 (1937).

[12]*Northwest Motors, Ltd.*, at 372-73.

[13]88 Wn.2d 331, 560 P.2d 353 (1977).

[14]*Dwelley*, at 335.

not express his intent to negotiate on the costs at a later time. His internalized subjective intent to object does not meet the objective manifestation test this court adopted in *Dwelley.*

The Court of Appeals concluded that any failure on Northwest's part to comply with the Automotive Repair Act need not be considered because Petitioner James is not entitled to raise the issue; and that Petitioner is precluded because his defenses were lost. The Court of Appeals was correct in holding that Petitioner James, by tendering his check for $3,596.42 to Northwest, manifested an intention to pay the amount indicated. Under the facts of this case, the transaction is exempt from the Automotive Repair Act under RCW 46.71.040.

The decision of the Court of Appeals is correct to the extent that it determined that the sum of $3,596.42 was owed to Northwest Motors by the Petitioners James. But the determination by the court that it was an "account stated" is at least debatable, but not fatal to its conclusion. We are of the opinion that the transaction is more properly characterized as *accord and satisfaction* and we affirm the Court of Appeals on that basis.

■■ Courts have historically tended to confuse the concept of *accord and satisfaction* with the concept of *account stated.* There are some similarities, yet some distinctions, between the two.[15] According to Corbin, "[d]ischarge by accord and satisfaction means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of [the claimant's] claim."[16]

Corbin further states that:

> The two parties may first make an accord executory, that is, a contract for the future discharge of the existing claim by a substituted performance still to be rendered. When this execu-

---

[15]*See* 6 A. Corbin, *Contracts* §§ 1276-1292, 1303-1315 (1962).

[16]A. Corbin § 1276, at 115.

tory contract is fully performed as agreed, there is said to be an accord and satisfaction, and the previously existing claim is discharged. . . .[17]

"[A]fter accord and satisfaction, one may not raise . . . any defense on the merits to the items which were originally in dispute. That is fundamental . . .".[18]

There is some basis for tentatively concluding that the transaction here was an "account stated". The Court of Appeals cited the Restatement (Second) of Contracts § 282 (1981), which states that:

(1) An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent.

(2) The account stated does not itself discharge any duty but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms.

The Court of Appeals also cited *Goodwin v. Northwestern Mut. Life Ins. Co.,*[19] which quoted a previous opinion[20] which stated:

"Generally speaking, an account stated is an agreed balance between parties who have had previous dealings involving the payment of, or agreement to pay, money; the account to become stated including an agreement that the items thereof are correct, and that the balance struck is justly due. From such a state of facts, the law presumes a promise to pay the balance as shown on the account. An account stated determines the amount of a debt, some previous liability having existed, and does not of itself create a primary obligation."

---

[17]A. Corbin § 1276, at 115.

[18]*Hotel Randolph Co. v. John C. Watrous Co.*, 144 Wash. 215, 218-19, 257 P. 629 (1927).

[19]196 Wash. 391, 410, 83 P.2d 231 (1938).

[20]*National Ass'n of Creditors, Inc. v. Ultican,* 190 Wash. 109, 66 P.2d 824 (1937).

Perhaps Corbin best articulates a comprehensible distinction between *accord and satisfaction* and *account stated*, which we approve in reaching our conclusion in this case:[21]

> If the transaction that is described by the court as an account stated is in fact a compromise of a doubtful or disputed claim or is an agreed liquidation of a claim theretofore uncertain in amount, the validity of the agreement does not depend on the validity of the antecedent claim. The new agreement is then either an accord executory or a substituted executory contract (an accord and satisfaction). For each party's promise in the new agreement there is an entirely new consideration — the return promise of the other party.

This action was brought to recover on a dishonored check. Once an "accord and satisfaction" has been established, all previous defenses are lost. Petitioner James did not object to the invoice balance of $3,596.42. He paid it by issuing his check which was dishonored when he immediately stopped payment after return of his Jaguar by Respondent Northwest. If he had objected, he might have avoided a determination that he assented to the automobile repair charges in excess of $2,500, assuming that he would have been entitled to rely upon the Automotive Repair Act.

We conclude that Petitioner James entered into an accord and satisfaction with Respondent Northwest, and is thus precluded from disputing the validity of the $3,596.42 charge represented by the check he wrote to pay it.

We therefore affirm the decision of the Court of Appeals in this case, including the award of attorneys' fees to respondent.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, GUY, and JOHNSON, JJ., concur.

---

[21]A. Corbin § 1312, at 261.